IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 11-CR-487 RB |
| | ) | |
| **IGNACIO VILLALOBOS**, | ) | |
| **a/k/a "Nacho"** and **"Nachito"**; | ) | |
| **BLAS GUTIERREZ**, | ) | |
| **a/k/a "Woody"**; | ) | |
| **EDDIE ESPINOZA**; | ) | |
| **ANGELO VEGA**; | ) | |
| **IAN GARLAND**; | ) | |
| **ALBERTO RIVERA**; | ) | |
| **MIGUEL CARRILLO**; | ) | |
| **RICARDO GUTIERREZ**; | ) | |
| **MANUEL ORTEGA**, | ) | |
| **a/k/a "Coruco"**; | ) | |
| **VICENTE CARREON**, | ) | |
| **a/k/a "Tito"**; and | ) | |
| **EVA GUTIERREZ**, | ) | |
| | ) | |
| Defendants. | ) | |

### UNITED STATES' MOTION FOR DETENTION AND MEMORANDUM OF LAW

The United States hereby moves for the detention of all Defendants, except Eva Gutierrez, and submits this Memorandum of Law in support. As will be explained below, there are not many crimes more dangerous to the community than trusted public officials in the United States trafficking firearms to the Mexican Cartels. Moreover, there is no set of conditions that will guarantee Defendants' appearances at future judicial proceedings.

# I.   __Background__

A.   <u>Overview of Firearms Trafficking</u>[1]

Mexican drug trafficking organizations, oftentimes referred to as the Mexican Cartels, are dependent on firearms to defend and expand their illegal narcotics trafficking activity, including their trafficking routes and corridors, distribution territories, and profits from the Mexican Government, law enforcement, and threats from competing cartels. Mexican Cartels rely on the commercial firearms market from the United States to supply their military wings and enforcers.

The Juarez Cartel, also known as the Vicente Carrillo Fuentes Organization is one such Mexican drug trafficking organization operating in Mexico primarily in the Mexican State of Chihuahua, which includes the cities of Juarez and Puerto Palomas, located on the United States-Mexico border across from El Paso, Texas and Columbus, New Mexico respectively.  To this end, the Juarez Cartel maintains control over the illegal activity into and out of the corridors between Puerto Palomas, Mexico, and Columbus, New Mexico among other areas. However, since approximately 2008, a rival drug trafficking organization known as the Sinaloa Cartel has challenged the Juarez Cartel's control over the territory and trafficking routes between Juarez and Puerto Palomas and the surrounding areas.

The primary enforcement arm of the Juarez Cartel is a group called "La Linea" that operate in, among other places, the Mexican State of Chihuahua including the cities of Juarez and Puerto Palomas, Mexico.

---

[1]The following overview of firearms trafficking is based on the Affidavit of ATF Senior Special Agent J.J. Ballesteros, attached hereto as Attachment 1.

The enforcement wings of the Mexican Cartels, including the Juarez Cartel's enforcers, "La Linea," prefer certain makes, models, and caliber of firearms for their tactical suitability. These "weapons of choice" are semi-automatic versions of military type rifles and pistols including AK-47 type rifles, AK-47 type pistols (resembling AK-47 rifles but with shorter barrels and without a rear stock), 9 mm pistols, and 5.7 mm pistols among others. AK-47 type pistols are particularly desired by Mexican Cartels because AK-47 type pistols are: (1) capable of accepting high-capacity magazines, meaning magazines that can hold numerous rounds of ammunition; (2) rugged and durable in extreme conditions; (3) easily convertible to fully automatic mode, meaning the firearm will continue to load and fire rounds of ammunition as long as the trigger is activated or until the firearm runs out of ammunition; and (4) easily concealable, transportable, and suitable for close-quarter combat due to the firearms' relatively small size.

The Mexican Cartels obtain the majority of their firearms from the United States' commercial market because these types of firearms are deemed for the "exclusive use of the Army and Air Force" and are otherwise prohibited from possession by the general public. In fact, according to Mexican authorities, the overwhelming majority of the illegal firearms seized in Mexico are from the United States' commercial market. This phenomenon results from the fact that the firearms laws in Mexico are extremely restrictive and controlled by the Mexican army as opposed to the open availability and accessibility of firearms in the neighboring United States commercial markets. While it is not impossible for Mexican citizens to possess firearms, the types of firearms available to the general public are extremely limited, and the qualification and registration processes are quite lengthy and expensive. In contrast, the firearms laws in the United States make it possible for a person to obtain firearms that are readily otherwise prohibited from

possession of the common citizen in Mexico. For this reason, the United States is known as a source country for firearms and Mexico is known as a demand country.

Firearms smuggled illegally by firearms traffickers are commonly purchased from licensed retail gun shops in the United States. Because of their unavailability in Mexico, these firearms are worth significantly more money in Mexico than in the United States.

When a firearms purchaser buys a firearm from a Federal Firearms Licensee (FFL), a business licensed under Chapter 44 of Title 18, United States Code to engage in the business of dealing in firearms, that buyer must fill out Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Form 4473, Firearms Transaction Record, listing the buyer's true name, current residential address, and other identifying information. The information on the ATF Form 4473 makes it possible to trace a firearm back to its retail purchaser. FFLs are required by Chapter 44 of Title 18, United State Code, to maintain these forms in their records.

In addition, ATF Form 4473 asks the purchaser: "Are you the actual transferee/buyer of the firearm(s) listed on this form? Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you . . . ." While it is possible to buy a gun and give it as a gift to someone, buying a gun on behalf of someone who wants to avoid being linked to the gun perpetrates a fraud against the United States in that it defeats the purpose of the 4473, a US Government form.

Mexican Cartels task their narcotics infrastructure with the job of obtaining firearms in the United States and smuggling them to Mexico. This is commonly accomplished by the use of "straw purchasers" in the United States. In the firearms context, a straw purchaser is someone who buys firearms for another person, either because the true purchaser is a prohibited possessor of firearms,

or because the true purchaser wants their identity hidden. The straw purchasers are usually persons without criminal records whom the narcotics traffickers can trust or dupe into signing the ATF 4473 forms.   Many recruiters of straw purchasers tend to be relatives or involved in narcotics trafficking. Firearms traffickers often employ a number of straw purchasers to buy firearms from licensed gun dealers.  These straw purchasers are commonly paid to falsely claim on the ATF Form 4473 that they are buying the firearm(s) for themselves, when in fact they are purchasing the firearm(s) on behalf of another.   Firearms purchased in furtherance of a firearms trafficking conspiracy are usually purchased in cash to further conceal the true buyer and source of funds.

Firearms traffickers commonly employ multiple straw purchasers to supply them with their firearms, ensuring that they have more than one source of firearms for distribution to their buyers. The use of multiple straw purchasers also avoids detection by law enforcement in that multiple people purchasing smaller amounts of firearms arouses less suspicion from law enforcement than one person purchasing a large amount of firearms.

B.    Overview of the Conspiracy

In its essence, the 26-page Indictment lays out a firearms trafficking scheme involving eleven defendants, and others, who primarily hail from Columbus, New Mexico, a small border village across from the Mexican city of Puerto Palomas in the Mexican State of Chihuahua.  The indictment demonstrates how from January 2010 to present, Defendants straw purchased and either smuggled to Mexico, or attempted to smuggle to Mexico, over 200 high-powered firearms of the type desired by Mexican Cartels:  primarily AK-47 type pistols and 9 mm pistols.

In broad strokes, the scheme involved defendants traveling from Columbus, New Mexico to Chaparral, New Mexico (a roughly 2-hour drive, which bypasses numerous firearms stores in

5

Deming and Las Cruces) to straw purchase firearms from Ian Garland at Chaparral Guns.[2]  After purchasing the firearms, defendants generally took the firearms to an El Paso apartment used as a stash house, and from there either smuggled the firearms to Juarez, Mexico via El Paso or to Puerto Palomas, Mexico via Columbus.  Law enforcement successfully seized from the defendants forty of the AK-47 type pistols destined for Mexico.  Mexican law enforcement seized in Mexico at least twelve of the firearms defendants already had straw-purchased and smuggled.  These seizures occurred in Juarez, Mexico, and at the murder scenes of five individuals in Puerto Palomas, Mexico.

Punctuating the indictment are the overt acts of Columbus Police Chief Angelo Vega, Village Trustee Blas Gutierrez, and Mayor Eddie Espinoza.  Center stage as well in the firearms trafficking scheme is Ian Garland, the Chaparral, New Mexico based gun dealer.

C.      Each Defendant's Particular Involvement

1.      Blas Gutierrez

On January 14, 2010, Blas Gutierrez and Miguel Carrillo possessed three AK-47 type pistols, two Ruger .45 caliber pistols, and three FN 5.7 mm pistols.  The three AK-47 type pistols and three FN 5.7 mm pistols had been purchased approximately five days before by straw purchasers in the District of Arizona.  *See Overt Act 1*.  FN 5.7 mm pistols are valued at around $1,000.00, and are commonly referred to in Mexico as the "mata policia," or "cop killer."  At least one of the Ruger .45 caliber pistols possessed by Blas Gutierrez and Miguel Carrillo on this date was recovered at murder scenes in Puerto Palomas, Mexico, around February 2011, and seen by United States federal agents around March 2011.

From January 2010, to March 2011, purchasers in Mexico placed order after order for firearms with Blas Gutierrez and his co-conspirators.  During this time span, Gutierrez personally,

_____

[2]Chaparral Guns is not a typical storefront.  Ian Garland operates Chaparral Guns out of his trailer home in which he and his wife live.

on thirteen separate occasions, purchased at least 56 firearms from Chaparral Guns, the majority of which were AK-47 type pistols or American Tactical 9 mm pistols.  *See Overt Acts 3, 6, 7, 8 , 9 , 10, 13, 14, 18, 19, 22, 56.*  Not only did he purchase firearms himself, Blas Gutierrez busily recruited and paid other straw purchasers to purchase at least 110 other firearms from Chaparral Guns, the majority of which were AK-47 pistols or American Tactical 9mm pistols.  *See Overt Acts  4, 5, 6, 7, 8, 10, 14, 19, 22, 30, 33, 34, 40, 42, 57.*

What follows is a sampling[3] of Blas Gutierrez's statements, in which Blas Gutierrez:

a.   asked an individual whether that individual's uncle or cousin was still prepared to sign for the firearms, s*ee Overt Act 27*;

b.   told Ian Garland that the individuals who were going to sign for the 40 AK-47 type pistols would be coming the next day, *see Overt Act 38; Attachment 2, call #471;*

c.   after having lost a number of AK-47 type pistols, stated to Gabriella Gutierrez: "Check this out, I'm going to have to pay $4,200.00 for ten of those fuc****, and another thousand for somebody to fuc**** get them out," *see Attachment 2, call #1977, p. 14;*

d.   after having lost a number of AK-47 type pistols, stated to Angelo Vega:  "they're waiting for them right now.  I called to, I called, I called the guy, that's in charge in uh, in uh, across the border from here. . . . and he is just waiting, he is all normal, he is all, 'hey well where you at' . . . [and later stated] I got some money, that I'm supposed to give that chick, that was gonna take them. . .. Yeah, it's like five grand. . . . they're fuc**** trusting me that far, you know what I mean?"; *Attachment 2, call #1032, pp. 12, 19;*

e.   after having lost a number of AK-47 type pistols, Blas Gutierrez told Angelo Vega:

_____

[3]The following sampling in no way constitutes all of Blas Gutierrez's incriminating statements.  It is merely included to give the Court a flavor of the strength of the evidence against Blas Gutierrez and his co-conspirators.

"They cannot prove . . . they cannot prove that I was going to sell them into Mexico," *see Attachment 2, call #1049, p. 7.*

In addition to firearms, numerous intercepted calls and text messages from Blas Gutierrez's telephones establish that Blas Gutierrez coordinated the purchase of thousands of dollars worth of body armor, radios, and other tactical combat gear for people in Mexico. *See Overt Acts 29, 32, 35, 55*; *Attachment 2, call #62.*

Besides the conspiracy count, Blas Gutierrez is charged with 17 counts of making false statements in connection with the acquisition of firearms and 19 counts of smuggling goods from the United States.

2.    Eddie Espinoza

On November 1, 2011, Espinoza paid $3,600 to lease Apartment #802 at the Colinas Del Sol Apartment Complex in El Paso, Texas (hereafter referred to as "Apartment #802"). *See Overt Act 16.* That apartment was utilized by the defendants to store AK-47 type pistols and 9 mm pistols before the firearms were smuggled to Mexico. *See Overt Acts 17, 23, 24, 41, 47, 48, 49.* Indeed, when agents searched Apartment #802 on February 14, 2011, they seized 20 AK-47 type pistols packed in duffle bags, 30 high capacity magazines, and a Dremel grinding tool kit.[4] *See Overt Act 48*; *Govt. Exs. 6 and 7* (depicting 20 AK-47 type pistols seized from Apartment #802 on February 14, 2011).

In October 2010, Espinoza visited Chaparral Guns on two separate occasions and straw purchased 12 firearms: seven AK-47 type pistols and five American Tactical 9 mm pistols. *See Overt Acts 11, 14.* On January 24, 2011, Espinoza returned to Chaparral Guns to straw purchase five more AK-47 type pistols. *See Overt Act 21.* One of the AK-47 type pistols Espinoza purchased on

---

[4]Dremel tools are commonly used by firearms traffickers to obliterate the serial numbers on firearms so that the firearms are more difficult to trace if ever recovered.

January 24, 2011, surfaced at a crime scene in Juarez, Mexico, in March 2011.  *Id*.  When Espinoza

was not busy leasing a stash house or sending text messages to Blas Gutierrez about straw

purchasing firearms, Espinoza was running federal agents out of the Village of Columbus.  *See*

*Overt Acts 12, 39, 45*.

Besides the conspiracy count, Espinoza is charged with three counts of making false

statements in connection with the acquisition of firearms and three counts of smuggling goods from

the United States.

3.      Angelo Vega

In text messages exchanged in February of 2011, Vega and Blas Gutierrez discussed how

Vega, in the year 2011 alone, had been paid more than $20,000 by Blas Gutierrez and his other co-

conspirators.  What follows is a sampling of Vega's actions that may have earned him such a

princely sum:[5]

a.      Vega, at Blas Gutierrez's direction, purchased a .45 caliber pistol and two-

way radios.  *See Overt Act 29*.

b.      Vega purchased thousands of dollars of tactical combat gear (including a

bullet proof vest) with his police credentials that he knew were going to be sent to Mexico.  *See*

*Overt Act 32*.

c.      after law enforcement had seized 20 AK-47 type pistols from Apartment

#802, Vega called an ATF agent on several occasions and lied to that agent about Blas Gutierrez's

involvement in firearms trafficking,  *See Overt Acts 53, 58*;

d.      after having lied to an ATF Agent about Blas Gutierrez's involvement in

firearms trafficking, Blas Gutierrez asked what Angelo Vega had told law enforcement, to which

_____

[5]The following sampling in no way constitutes all of the evidence against Angelo Vega.

Angelo Vega stated, "Nothing, I just told him a fuc**** lie," *see Attachment 2, call #1697, p. 2;*

e.      after law enforcement had seized 20 AK-47 type pistols from Apartment #802, Vega told Blas Gutierrez that Manuel Ortega had likely already sent the 20 AK-47 type pistols "to Mexico or something brother," and that Blas Gutierrez should purchase a gun safe to protect the next batch of firearms, *see Overt Acts 47, 50*; *Attachment 2, call #1032,* p.10;

f.      Vega agreed to get an AR-15 semi-automatic rifle and four bullet proof vests for Blas Gutierrez.  *See Overt Acts 51, 55*;

g.      Angelo Vega and Blas Gutierrez discussed outfitting a Village of Columbus van so that it could be used to transport "600," because Blas Gutierrez had just been notified that "they gave the go to start off with 600."  *See attachment 2, call #625.*

Vega is currently charged with one count of conspiracy.

4.      <u>Ian Garland</u>

Defendants traveled to Chaparral Guns time and time again for their firearms needs because Ian Garland was more interested in turning a profit than abiding by the firearms laws.  Garland's unlawful activity began in the summer of 2010, when known individuals visited Chaparral Guns with Blas Gutierrez on several occasions to straw purchase guns.  *See Overt Acts 4, 5, 7, 8.*  During these straw purchases, the known individuals generally did not tell Garland what firearms they wanted to buy.  Instead, the known individuals handed their driver's licenses to Garland, and filled out ATF Form 4473s.  Thereafter, Garland generally took the money from Blas Gutierrez and gave the firearms to Blas Gutierrez or other co-conspirators of Blas Gutierrez.  *Id*.  Garland's proclivity to close his eyes during purchases continued through February 2011.  In February 2011, numerous intercepted calls and text messages were exchanged between Garland and Blas Gutierrez, in which Blas Gutierrez told Garland that he (Blas Gutierrez) would be sending people in to "sign" for

firearms.  *See Overt Acts 33, 38, 52*.  On the evening of February 10, 2011, for example, Blas Gutierrez sent Ricardo Gutierrez to Chaparral Guns to "sign" for 10 AK-47 type pistols.  *See Overt Act 33*.  After Ricardo Gutierrez filled out the purchase paperwork for the AK-47 type pistols, Ricardo left Chaparral Guns without any firearms, and Blas Gutierrez and Garland exchanged text messages about how Ricardo Gutierrez had not messed up the paperwork.  *Id*.  Then, the next morning, Blas Gutierrez drove the 100 or so miles to Chaparral Guns to pick up the same 10 AK-47 type pistols that Ricardo Gutierrez signed for the night before.  *See Overt Act 34*.

Besides the conspiracy count, Garland is charged with six counts of making false statements in connection with the acquisition of firearms and one count of smuggling goods from the United States.

### 5.   Alberto Rivera

From August 2010, to February 2011, Rivera visited Chaparral Guns on nine separate occasions.  During this seven-month period, Rivera purchased 52 firearms for people in Mexico, half of which were AK-47 type pistols and half of which were American Tactical 9 mm pistols.  *See Overt Acts 6, 8, 10, 11, 15, 19, 20, 30, 56*.  Two of the AK-47 type pistols Rivera purchased on January 20, 2011, have surfaced at two different crime scenes in Juarez, Mexico, in February 2011, and in March 2011.  *See Overt Act 20*.

Besides the conspiracy count, Rivera is charged with nine counts of making false statements in connection with the acquisition of firearms and nine counts of smuggling goods from the United States.

### 6.   Miguel Carrillo

On January 14, 2010, Blas Gutierrez and Miguel Carrillo possessed three AK-47 type pistols, two Ruger .45 caliber pistols, and three FN 5.7 mm pistols.  The three AK-47 type pistols and three

FN 5.7 mm pistols had been purchased approximately five days before by straw purchasers in the District of Arizona.  *See Overt Act 1*.  FN 5.7 mm pistols are valued at around $1,000 and are commonly referred to as "cop killers" because of their ability to penetrate bullet proof vests.  At least one of the Ruger .45 caliber pistols possessed by Blas Gutierrez and Miguel Carrillo on this date was recovered at murder scenes in Puerto Palomas, Mexico, around March 2011.

Carrillo visited Chaparral Guns to straw purchase firearms on September 5, 2010, and February 12, 2011.  During these two visits, Carrillo purchased 14 AK-47 type pistols.  *See Overt Acts 7, 40*.  One of the AK-47 type pistols Carrillo purchased on September 5, 2010, surfaced at a crime scene in Juarez, Mexico in March 2011.  *See Overt Act 7*.

Besides the conspiracy count, Carrillo is charged with two counts of making false statements in connection with the acquisition of firearms and three counts of smuggling goods from the United States.

7.     Ricardo Gutierrez

In less than 30 days, Ricardo Gutierrez visited Chaparral Guns on three separate occasions. During those three visits, Ricardo Gutierrez purchased 30 firearms, 20 of which were AK-47 type pistols, 10 of which were American Tactical 9 mm pistols.  *See Overt Acts 19, 22, 30, 33*.  Four of the AK-47 type pistols Rivera purchased on January 13, 2011, have surfaced at two different crime scenes in Juarez, Mexico, in February 2011, and in March 2011.  *See Overt Act 19*.

Besides the conspiracy count, Ricardo Gutierrez is charged with three counts of making false statements in connection with the acquisition of firearms and three counts of smuggling goods from the United States.

8.     Manuel Ortega and Vicente Carreon

On January 25, 2011, Manuel Ortega, along with Blas Gutierrez, Ricardo Gutierrez, and

Vicente Carreon, visited Chaparral Guns and attempted to purchase firearms, but was unsuccessful in purchasing firearms because Ortega had a domestic violence conviction. *See Overt Act 23*. After Blas Gutierrez and Ricardo Gutierrez purchased 20 American Tactical 9 mm pistols on that visit, the four traveled to the stash house, Apartment #802. *Id*. Then Carreon, who is a convicted felon, left Apartment #802 and traveled by himself to Kmart to purchase a black backpack. *Id*. When Carreon returned to Apartment #802, he was observed carrying the black backpack, along with a box containing the twenty firearms purchased that day, into Apartment #802. *Id*. Shortly thereafter, Ortega exited Apartment #802 with the black backpack, which was now full. *Id*. Ortega and Blas Gutierrez went, in a Ford F-150 unmarked police vehicle registered to the Village of Columbus with the black backpack to the El Paso, Texas bus station, located on the corner of 6th Street and Oregon Street, where they transferred the firearms to an unknown individual. *Id*.

In addition, on February 9, 2011, after Alberto Rivera and Blas Gutierrez purchased ten firearms at Chaparral Guns, Alberto Rivera, Blas Gutierrez and Vicente Carreon drove to a nearby dumpster, tore off parts of the UPC codes and serial numbers from the firearms boxes, and threw the firearms boxes in a dumpster. *See Overt Act 30*.

Besides the conspiracy counts, Ortega and Carreon are each charged with one count of smuggling goods from the United States.

## II.    **Legal Standards**

The United States seeks detention on the basis that the defendants present a serious danger to the community and risk of flight. Only pretrial detention will reasonably assure the safety of the community and the defendants' appearances at future judicial proceedings.

To determine whether there are conditions that can reasonably assure Defendant's appearance at trial and the safety of the community, the Court shall consider:

(1)     the nature and circumstances of the crime charged;

(2)     the weight of the evidence against the defendant;

(3)     the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse history, and past conduct; and

(4)     the nature and seriousness of the danger to the community or to an individual that would be posed by release.

*See* 18 U.S.C. § 3142(g).  The government must prove risk of flight by a preponderance of the evidence, and dangerousness to another person or the community by clear and convincing evidence.

*See United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003).

### III.   Discussion

Except for Eva Gutierrez, the § 3142(g) factors point in one direction for all Defendants -- detention.

### A.    Nature and Circumstances of the Offenses

To begin, offenses involving firearms are immediately placed in a category of cases that are simply more dangerous than others.  *See* 18 U.S.C. § 3142(g)(1) (singling out crimes involving firearms, crimes of violence, and crimes involving minor victims); *United States v. Carey*, 578 F. Supp. 2d 190, 192 (D. Me. 2008) (observing that the involvement of firearms factors against release).        This, however, is no run-of-the-mill firearms case.  To the contrary, it involves elected and public officials conspiring to straw purchase firearms for the Mexican Cartels, and then smuggle those firearms to the true purchasers in Mexico.  The inherent dangers of firearms offenses are magnified in straw purchasing cases because straw purchasers, and the gun dealers who assist the straw purchasers, defeat society's and Congress's attempts to keep firearms out of the hands of those who should not have them.  Courts consistently recognize the dangerousness of these offenses, and sentence such defendants accordingly, even imposing sentences that are well above the top of the guideline range.  *See, e.g., United States v. Jackson*, 2006 WL 3741845, at *2 (3d Cir. Dec. 20,

2006) (unpublished) (finding that a sentence for a straw purchaser at nearly double the top of the guideline range was substantively reasonable because the statutory maximum for a violation of 18 U.S.C. § 924(a)(1)(A) was five years and the district court meaningfully explained why "the guideline range was inadequate in light of the seriousness of the offense, and the need to deter others from committing like offenses").  As one court explained in a firearms straw purchasing case:

> The access to firearms through illegal channels is a problem for law enforcement of immense proportions . . . the sale and transportation of firearms illegally purchased represents a serious crime.  Any sentence of a person such as the defendant utilizing straw purchases to purchase weapons, must be of such a nature to promote respect for the law and provide just punishment for the offense.  Against that background, a sentence at the highest level of the advisory sentencing guideline range is appropriate.

*United States v. Arzu*, 2007 WL 2713908, at *3 (N.D. Ohio Sept. 17, 2007).  As another court observed:

> Whether or not there was a victim, [the defendant] used a false name to purchase three firearms.  The act alone created a significant danger to the public, which is only increased by the possibility that he made the purchase on someone else's behalf – someone who may have had a more serious and more recent criminal history.

*United States v. Elsaddique*, 2007 WL 3230167, at *1 (11th Cir. Nov. 2, 2007) (unpublished). Moreover, the dangers of straw purchasing heighten when the guns involved are high-powered semi-automatic AK-47 type pistols and 9 mm handguns.

Needless to say, the dangerousness of the offenses redlines when the firearms are straw purchased in the borderlands of the United States on behalf of the Mexican Cartels, and then smuggled into Mexico so that the Mexican Cartels may wage their bloody turf battles.  It should come as no surprise then that the firearms purchased in this conspiracy have surfaced in Juarez and Puerto Palomas, Mexico, with a shockingly short "time to crime."[6]  It should also be no surprise that

---

[6]"Time to crime" indicates the amount of time between the purchase of the firearm and its subsequent recovery.

the firearms have not been found in Mexico at hunting lodges and shooting ranges.  Instead, as demonstrated below, the firearms purchased and smuggled by this organization have been seized at murder scenes and in the hands of kidnappers.  What follows is a chart[7] showing the firearms linked to this conspiracy that have been seized in Mexico thus far, and the known circumstances of the seizures:

| Firearm(s) | Purchaser/Seen With | Recovery Date/Place in Mexico | Circumstances of Seizure | Photograph taken in Mexico |
|---|---|---|---|---|
| One Ruger .45 caliber pistol bearing serial number 661-28500 | January 14, 2010-seen with **Blas Gutierrez** and **Miguel Carrillo** | February 8, 2011, in Puerto Palomas, Mexico | Murder crime scene | Govt. Ex. 1, and depicted in Govt. Ex. 2 as silver handgun in top left corner |
| One AK-47 type pistol bearing serial number DR-2746-09 | February 13, 2010-purchased by **Blas Gutierrez** | February 8, 2011, in Puerto Palomas, Mexico | Murder crime scene | Depicted as the AK-47 type pistol with wooden stock in Govt. Ex. 2 |
| One AK-47 type pistol bearing serial number AKP-C900268 | June 27, 2010 - purchased by **Blas Gutierrez** | March 4, 2011, in Ciudad Juarez, Mexico | Narcotics seizure | Depicted in Govt. Ex. 5 |
| One AK-47 type pistol bearing serial number AKP-C900197 | July 13, 2010-purchased by a known individual at the direction of **Blas Gutierrez** | February 8, 2011, in Puerto Palomas, Mexico | Murder crime scene | Depicted as all black AK-47 type pistol in Govt. Ex. 2 |
| One AK-47 type pistol bearing serial number 1968BI2746 | September 5, 2010-purchased by **Miguel Carrillo** | March 4, 2011, in Ciudad Juarez, Mexico | Narcotics seizure | Depicted in Govt. Ex. 5 |
| Two AK-47 | September 5, | Seized in Juarez | Unknown | No photo yet. |

_____

[7]The following chart is based on the information contained in the Affidavit of ATF Special Agent Moises Maldonado, attached hereto as Attachment 3.

| pistols bearing serial numbers 1968BH4904 and 1968BF0850 | 2010-one purchased by **Blas Gutierrez** and one by **Miguel Carrillo** | on an unknown date; viewed by ATF Agent in Juarez on March 7, 2011 | | |
|---|---|---|---|---|
| One AK-47 type pistol bearing serial number 1968BH4008 | January 13, 2011-purchased by **Ricardo Gutierrez** | March 4, 2011, in Ciudad Juarez, Mexico | Narcotics seizure | Depicted in Govt. Ex. 5 |
| Three AK-47 type pistols bearing serial numbers 1969BM2643, 1969BS2283, and 1968BF3757 | January 13, 2011-purchased by **Ricardo Gutierrez** | February 9, 2011, in Ciudad Juarez, Mexico | Three dead individuals in a vehicle | Govt. Ex. 3 |
| One AK-47 type pistol bearing serial number 1969BS2230 | January 20, 2011-purchased by **Alberto Rivera** | February 22, 2011, in Ciudad Juarez, Mexico | Kidnapping crew | Govt. Ex. 4 |
| One AK-47 type pistol bearing serial number 1968BG3736 | January 20, 2011-purchased by **Alberto Rivera** | March 4, 2011, in Ciudad Juarez, Mexico | Narcotics seizure | Depicted in Govt. Ex. 5 |
| One AK-47 pistol bearing serial number 1968BI1092 | January 20, 2011-purchased by **Alberto Rivera** | Seized in Juarez on an unknown date; viewed by ATF Agent in Juarez on March 7, 2011 | Unknown | No photo yet. |
| One AK-47 type pistol bearing serial number DC-4852-10 | January 24, 2011-purchased by **Eddie Espinoza** | March 4, 2011, in Ciudad Juarez, Mexico | Narcotics seizure | Depicted in Govt. Ex. 5 |

The nature and circumstances of the offenses charged weigh heavily in favor of detention.

B.     Weight of the Evidence

The evidence against Defendants is formidable, as in most Title III wiretap cases where defendants freely discuss their crimes.  To assess this factor at the detention stage, the Court should take judicial notice of the 26-pages of specific allegations set forth in the Indictment, in addition to the summary of intercepted calls set forth above.  The Court properly may infer from the number of factual allegations, and the specificity with which they are made, that the evidence against Defendants is strong indeed.  And although the United States "need not offer all of its evidence" at the detention stage of the proceeding, *Cisneros*, 328 F.3d at 618, suffice it to say that the factual allegations will be corroborated by the powerful evidentiary combination of what law enforcement surveilled during the investigation, as well as the post-arrest statements by some of the Defendants.

As if Defendants did not already have enough incentives to flee, it appears Mexico's Attorney General's Office is analyzing this case, with a view towards deciding whether Mexico will seek the extradition of Defendants.  *See Attachment 4* (March 13, 2011 News Article from The Brownsville Herald).  The undersigned Assistant United States Attorneys have not been able to confirm with Mexican officials their current stance on whether Mexico will be extraditing Defendants for their crimes.

Altogether, the weight of the evidence is a factor militating heavily in favor of pretrial detention.

C.     History and Characteristics

The most reliable information in the United States' possession concerning Defendants' character and past conduct is the Indictment itself.  The scheme set forth in the Indictment paints a story of a dangerous firearms trafficking group linked to the Mexican cartels,  who operated with no concern for the international consequences of their actions, and the fact that they were furthering

murder and violence at epic levels in Mexico.  Defendants perpetrated their crimes through a web of lies and deceit -- whether lying on the ATF 4473 firearms purchase forms, lying to local and federal law enforcement, or misusing Village of Columbus property to further their crimes -- all of which speak eloquently, and loudly, to Defendants' character.

It is further believed that the pretrial services report will disclose criminal history for Angelo Vega, Manuel Ortega, and Vicente Carreon, all of which bear on their character and proclivities.

The United States has no information about Defendants' physical or mental condition that is relevant to the Court's detention decision, apart from knowing that Eddie Espinoza requires dialysis treatment.  It is believed that the United States Marshals Service is well-equipped to address Eddie Espinoza's dialysis needs, and should be in a position to address whatever conditions may ail the remainder of the Defendants.

At the detention hearing, it is anticipated Defendants will emphasize their family and community ties as reasons for pretrial release.  The United States peremptorily responds in three ways.  First, Defendants' ties to Mexico are strong, indicating that Defendants pose a significant flight risk.  Defendants' links to Mexico are evidenced by both the fact that they were smuggling firearms to people in Mexico, and their significant history of crossing between the United States and Mexico.[8]  Second, no matter how strong a defendant's connection to the community may be, their aversion to spending a significant time in federal prison, and possibly being extradited to Mexico, is significantly stronger.  Defendants should be equally averse to responding to the people in Mexico about the lost firearms and the publicity now brought to the Columbus-Puerto Palomas area.  Third, the presence of community ties simply has no bearing on the issue of safety of the community, s*ee, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1088 (9th Cir. 2008) – an issue that casts a dark cloud over

---

[8]The United States anticipates that the pretrial services reports will contain information about Defendants' significant crossing history between the United States and Mexico.

this case.

In sum, Defendants' history and characteristics only exacerbate, rather than ameliorate, the Court's concerns about the danger Defendants pose and their risks of flight.

D.    Nature and Seriousness of Danger to Any Person or Community

As already discussed, the instant offense conduct is dangerous and has international, and life and death implications.  Releasing members of a firearms trafficking group back into a small village on the international border with Mexico -- a village that the trafficking group essentially controlled by having placed themselves in the highest elected and appointed positions there -- should give the Court abundant pause.  Certain Defendants have proven that they are willing to use their positions of trust and power to no limit.  The risk, therefore, that certain Defendants will engage in witness tampering and obstruction of justice if released into the community they used to control is high.

Ian Garland poses a significant danger to the community because his livelihood has been dealing in dangerous firearms and conspiring with individuals to straw purchase firearms and illegally export them.  The grand jury has determined that Ian Garland is unable to comply with the firearms laws and is willing to commit crimes in the interest of making a profit.  There is a real risk that he will continue to engage in the illegal sale of firearms destined for Mexico if released prior to trial, and monitoring whether or not he is doing so by pretrial services would be virtually impossible.

There is a also a significant likelihood that Defendants themselves are in danger because they were not successful in committing all of their crimes; a danger that could spill over and affect other members of the community.

Moreover, it should be emphasized that Defendants are charged with crimes under United States laws that had substantial harmful effects on communities in Mexico, and that closely link

20

Defendants to individuals in Mexico who may still want their firearms.  Accordingly, there is a significant likelihood that Defendants could be compelled to deliver additional firearms to Mexico which would pose a serious danger to the citizens of our southern neighbor.  *See United States v. Hir*, 517 F.3d 1081, 1088-89 (9th Cir. 2008) ("Where a defendant is charged with committing a crime under United States law that had a substantial harmful effect on a community overseas, we hold that a court should consider the danger that would be posed to that community if the defendant were released pending trial.").

Accordingly, the dangers Defendants pose to themselves, other people, and communities at home and abroad, necessitate pretrial detention.

**IV.**   **Conclusion**

Apart from Eva Gutierrez, Defendants are a danger to the community, and pose serious risks of flight if released, and there is no condition or combination of conditions of release that will adequately address these concerns.  Accordingly, the United States respectfully asks the Court to detain all Defendants pending trial.

Respectfully submitted,


KENNETH J. GONZALES
United States Attorney

**Electronically Filed 3/14/2011**
NATHAN J. LICHVARCIK
MICHAEL NAMMAR
Assistant U.S. Attorneys
555 S. Telshor Blvd., Ste. 300
Las Cruces, NM  88011
(575) 522-2304

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

**Electronically Filed 3/14/2011**
Nathan J. Lichvarcik
Assistant U.S. Attorney